No. 25-10668

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

BILL WORD, DAVID DAQUIN, *Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF ENERGY, *Defendant-Appellee*,

On Appeal from the United States District Court for the Northern
District of Texas, Amarillo Division Case No. 2:24-cv-00130

**PLAINTIFFS-APPELLANTS' PRINCIPAL BRIEF**

Devin Watkins
  *Counsel of Record*
COMPETITIVE ENTERPRISE INSTITUTE
1310 L Street NW, 7th Floor
Washington, DC 20005
(202) 331-1010
devin.watkins@cei.org

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

Counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.


**Plaintiffs-*Appellants*:**
Bill Word
David Daquin

**Counsel for Plaintiffs:**
Devin Watkins
David McFadden

**Counsel for Plaintiffs' Employer:**
Competitive Enterprise Institute

**Defendant-*Appellee*:**
U.S. Department of Energy

**Counsel for Defendant:**
Amanda Mundell
Jason C. Lynch

/s/ *Devin Watkins*
Devin Watkins

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs respectfully request oral argument. This case concerns whether the U.S. Department of Energy will be forced to follow its statutory limits. Given that importance, Plaintiffs believe that oral argument would be useful to the Court in resolving this case.

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ iv

TABLE OF AUTHORITIES .................................................................. v

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUES PRESENTED FOR REVIEW ................................................... 1

STATEMENT OF THE CASE .............................................................. 2

I.    Legal Background ...................................................................... 2

II.   Procedural Background ............................................................ 6

STANDARD OF REVIEW .................................................................... 8

SUMMARY OF ARGUMENT ............................................................. 8

ARGUMENT ......................................................................................... 9

I.    Plaintiffs Have Standing ........................................................... 9

II.   The District Court Possessed Equitable Jurisdiction Over
Plaintiff's Claims ................................................................... 12

III.  The Petition-For-Review Remedy Did Not Extinguish Equitable
Remedies for Ultra Vires Agency Action. ............................... 17

    A. Congress Explicitly Preserved District Court Equitable Relief in
42 U.S.C. § 6306(b)(4). ........................................................ 20

    B. Plaintiffs' Claims Are Not of the Type Congress Intended to Be
Exclusively Reviewable Under Only § 6306(b)(1). .................. 35

CONCLUSION ................................................................................... 58

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) .................... passim

*American School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ................................................................. 13

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ............ 13

*Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563 (1939).............. 12

*Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023).........29, 33

*Bank of La. v. FDIC*, 919 F.3d 916 (5th Cir. 2019) ............. 17, 18, 40, 41

*Carroll v. Safford*, 44 U.S. 441 (1845) ............................................ 13, 14

*Cochran v. U.S. Sec. & Exch. Comm'n*,
20 F.4th 194 (5th Cir. 2021)................................................... 43

*Cuozzo Speed Technologies, LLC v. Lee*, 579 U.S. 261 (2016)............... 46

*DeOtte v. State*, 20 F.4th 1055 (5th Cir. 2021)...................................... 12

*Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012)........................ 19, 33, 42

*Field v. Mans*, 516 U.S. 59 (1995) .......................................................... 28

*Ford v. NYLCare Health Plans of Gulf Coast, Inc.*,
301 F.3d 329 (5th Cir. 2002) .................................................. 10

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ........................................................... passim

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ................................................................ 12

*Guar. Tr. Co. v. York*, 326 U.S. 99 (1945) .............................................. 13

*Hall v. Hall*, 584 U.S. 59 (2018) ............................................................ 28

*Houston Refining, L.P. v. United Steel, Paper and Forestry, Rubber, Mfg.*, 765 F.3d 396 (5th Cir. 2014) ........................................................ 8

*JTB Tools & Oilfield Services, L.L.C. v. United States*, 831 F.3d 597 (5th Cir. 2016) .................................................... 40, 41, 42

*Kirby Corp. v. Pena*, 109 F.3d 258 (5th Cir. 1997) ........................... 53, 54

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ...................................................... 51

*Leedom v. Kyne*, 358 U.S. 184 (1958) .................................................... 53

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ............. 51

*Louisiana v. DOE*, 90 F.4th 461 (5th Cir. 2024) .................... 4, 10, 15, 54

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 145 S. Ct. 2006, 2016 n.4 (2025) ........................................................ 46

*Natural Resources Defense Council v. Abraham*, 355 F.3d 179 (2d Cir. 2004) .................................................................. 29

*New York v. Abraham*, 199 F. Supp. 2d 145 (S.D.N.Y. 2002) ................ 29

*Nuclear Regulatory Commission v. Texas*, 145 S. Ct. 1762 (2025) ...................................................... 15, 16, 34, 57

*Railway Clerks v. Association for Benefit of Noncontract Employees*, 380 U.S. 650 (1965) .......................................................................... 15

*Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31 (1st Cir. 2002) ................................................................ 15

*Stallworth v. Bryant*, 936 F.3d 224 (5th Cir. 2019) ................................ 8

*Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186 (7th Cir. 1986) .......... 30

*Taggart v. Lorenzen*, 587 U.S. 554 (2019) ............................................. 28

*Telecommunications Research & Action Center*,
    750 F.2d 70 (D.C. Cir. 1984)...................................................... 39

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994).................. passim

*Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust
    Co.*, 379 U.S. 411 (1965) ......................................................... 20

*Woodard v. Andrus*, 419 F.3d 348 (5th Cir. 2005).................................. 11

**Statutes**

1 Stat. 78, § 11 ...................................................................................... 12

21 U.S.C. § 371(f)(6) ............................................................................ 25

28 U.S.C. § 1291 .................................................................................... 1

28 U.S.C. § 1331 ................................................................................ 1, 16

28 U.S.C. § 1346 .................................................................................... 1

28 U.S.C. § 1346(a)(2)........................................................................... 17

42 U.S.C. § 6291(6) ............................................................................... 16

42 U.S.C. § 6291(6)(A) ........................................................................... 2

42 U.S.C. § 6306(b)(1)...................................................................... passim

42 U.S.C. § 6306(b)(2)....................................................................... 22, 23

42 U.S.C.§ 6295(g)(10)(A)(i) ................................................................... 3

42 U.S.C.§ 6295(g)(10)(A)(ii) .................................................................. 3

42 U.S.C.§ 6295(g)(9)(A)(ii) .................................................................... 3

5 U.S.C. § 703 ................................................................................... 39, 40

5 U.S.C. § 705 ................................................................................... 21, 22

5 U.S.C. § 706(1) ..................................................................... 21, 23

5 U.S.C. § 706(2) ..................................................................... 21, 23

Process Act of 1792, 1 Stat. 275 § 2 ....................................... 13

**Other Authorities**

1 Joseph Story, *Commentaries on Equity Jurisprudence*
§ 33, at 32–33 (1836) ............................................................ 14

Docket No. 24-60316, ECF No. 1 ............................................ 27

DOE, Final Rule Technical Support Document, ch. 3 at 330 (Nov. 22,
2016), https://www.regulations.gov/document?D=EERE-2014-BT-
STD-0021-0029 ..................................................................... 11

Eugene A. Jones, *Manual of Equity Pleading and Practice* (1916) ....... 31

H.R. Rep. No. 2139, 75th Cong., 3d Sess., 11 ........................ 27

H.R. Rep. No. 2755, 74th Cong., 2d Sess., 8 .......................... 26

Joseph H. Koffler & Alison Reppy, *Handbook of Common Law
Pleading* (1969) .................................................................... 32

Thomas W. Merrill, Article III, *Agency Adjudication, and the Origins of
the Appellate Review Model of Administrative Law*,
111 Colum. L. Rev. 939 (2011) ............................................ 32

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................ 10

**Regulations**

42 U.S.C. § 6295 ...................................................................... 6

42 U.S.C. § 6306(b)(4) .................................................... passim

89 Fed. Reg. 19,026 (Mar. 15, 2024) ................................. 4, 16

89 Fed. Reg. 31,096 (Apr. 24, 2024) .......................................................... 4

Energy Conservation Program: Energy Conservation Standards for
Dishwashers, 89 Fed. Reg 31,406 (Apr. 24, 2024) ................................. 6

Energy Conservation Program: Energy Conservation Standards for
Residential Clothes Washers 77 Fed. Reg. 32,308 (May 31, 2012) ....... 4

Energy Conservation Program: Energy Conservation Standards for
Residential Clothes Washers,
89 Fed. Reg. 19,026, 19,032 (Mar. 15, 2024) ......................................... 6

Energy Conservation Program: Energy Conservation Standards for
Residential Dishwashers, 77 Fed. Reg. 31,918 (May 30, 2012). ........... 3

## INTRODUCTION

This appeal presents a single, dispositive question: whether the district court is deprived of subject-matter jurisdiction under its traditional equitable authority to issue declaratory and injunctive relief against ultra vires agency action by the U.S. Department of Energy contrary to its statutory authority and in violation of explicit limits of its authority. Although the merits of Plaintiffs' claims are not before this Court, the nature of those claims underscores why Plaintiffs properly invoked the district court's equitable jurisdiction.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1346. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

(1) Whether the district court is deprived of subject-matter jurisdiction under its traditional equitable authority to issue declaratory and injunctive relief against ultra vires agency action by the U.S. Department of Energy contrary to its statutory authority and in violation of explicit limits of its authority.

# STATEMENT OF THE CASE

## I. Legal Background

In 1973, the Arab members of the Organization of Petroleum Exporting Countries (OPEC) imposed an oil embargo against the United States, triggering a national energy crisis. In response, Congress enacted the Energy Policy and Conservation Act of 1975 (EPCA) to reduce the country's dependence on foreign oil by establishing, for the first time, energy conservation standards for residential appliances. Notably, at that time, Congress did not authorize any restrictions on water usage in residential appliances.

In the Energy Policy Act of 1992, Congress amended EPCA to allow DOE to regulate the water efficiency limits for a limited set of four plumbing products: showerheads, faucets, water closets, and urinals. *See* 42 U.S.C. § 6291(6)(A). Congress did not confer authority on DOE to impose water use standards on appliances such as dishwashers and clothes washers.

In the Energy Policy Act of 2005, Congress took the additional step of directly establishing specific water use limits for dishwashers and clothes washers. These statutory limits were defined as follows:

- Residential standard-size clothes washers: 9.5 gallons/cycle/ft$^3$.

  42 U.S.C. § 6295(g)(9)(A)(ii).

- Standard-size dishwasher: 6.5 gallons/cycle. 42 U.S.C.

  § 6295(g)(10)(A)(i).

- Compact dishwashers: 4.5 gallons/cycle. 42 U.S.C.

  § 6295(g)(10)(A)(ii).

Congress did not expand DOE's authority to regulate the water

limits of dishwashers and clothes washers.

Despite these statutory constraints, in 2012, DOE promulgated

regulations that significantly tightened the water use limits for

residential dishwashers and clothes washers. These rules reduced

allowable water usage as follows:

- Standard-size dishwasher: 5 gallons/cycle. Energy Conservation

  Program: Energy Conservation Standards for Residential

  Dishwashers, 77 Fed. Reg. 31,918, 31958 (May 30, 2012).

- Compact dishwashers: 3.5 gallons/cycle. *Id.*

- Top-loading compact clothes washers:14.4 gallons/cycle/ft$^3$.

  Energy Conservation Program: Energy Conservation Standards

for Residential Clothes Washers 77 Fed. Reg. 32,308, 32,310 (May 31, 2012).

- Top-loading standard-size clothes washers: 6.5 gallons/cycle/ft$^3$. *Id.*

- Front-loading compact clothes washers: 8.3 gallons/cycle/ft$^3$. *Id.*

- Front-loading standard-size clothes washers: 4.7 gallons/cycle/ft$^3$. *Id.*

In *Louisiana v. DOE*, this Court rejected DOE's authority to regulate water use in dishwashers and clothes washers, observing it was "unclear how or why DOE thinks it has any statutory authority to regulate 'water use' in dishwashers and washing machines." 90 F.4th 461, 470 (5th Cir. 2024). The Court's analysis in Section III.B.1.a of its opinion explained in detail why DOE lacks such authority under EPCA. Id. at 470–72.

Nevertheless, DOE persisted. In 2024, DOE issued two final rules further reducing water use limits—one addressing dishwashers (89 Fed. Reg. 31,096 (Apr. 24, 2024)) and one addressing clothes washers (89 Fed. Reg. 19,026 (Mar. 15, 2024)). These rules not only imposed more stringent water restrictions but also revised product classifications,

redefining "compact" front-loading dishwashers from 1.6 cubic feet to 3 cubic feet and rebranding prior compact top-loading dishwashers as "ultra-compact." Additionally, DOE abandoned its prior volumetric scaling method for clothes washers, instead adopting a weighted-average load size measured in pounds. The new standards included:

- Standard-size dishwasher: 3.3 gallons/cycle. 89 Fed. Reg. at 31114.

- Compact dishwashers: 3.1 gallons/cycle. *Id.*

- Top-loading ultra-compact clothes washers: 0.29 lb/gallons/cycle. 89 Fed. Reg. at 19,028.

- Top-loading standard-size clothes washers: 0.57 lb/gallons/cycle. *Id.*

- Front-loading compact clothes washers: 0.71 lb/gallons/cycle. *Id.*

- Front-loading standard-size clothes washers: 0.77 lb/gallons/cycle. *Id.*

DOE has acknowledged that EPCA's "definition of 'energy conservation standard,' in section 6291(6), expressly references water use only for four products specifically named: showerheads, faucets,

water closets, and urinals."89 Fed. Reg. at 19,032, 31,406. However, when "DOE construes the statute as a whole," DOE found that "[w]hen Congress added products and standards directly to 42 U.S.C. 6295 it must have meant those products to be covered products and those standards to be energy conservation standards." 42 U.S.C. § 6295; 89 Fed. Reg. at 19,033, 31,407. DOE's argument effectively posits a legislative drafting error—suggesting Congress inadvertently omitted words that would have granted DOE broader authority.

## II.     Procedural Background

On June 13, 2024, Plaintiffs filed suit in the district court, promptly challenging the Department of Energy's most recent interpretation of its statutory authority imposing more stringent water use limits on dishwashers and clothes washers. Plaintiffs sought three principal forms of relief:

> (1) Declaratory relief that DOE is currently without lawful authority to amend the water efficiency requirements of appliances other than showerheads, faucets, water closets, or urinals.

(2) injunctive relief for DOE to issue new regulations setting the water limits on dishwashers and clothes washers to that which was set by Congress, and

(3) injunctive relief against DOE issuing future unlawful water limits on any but the four enumerated plumbing appliances absent future statutory authority.

On August 19, 2024, DOE moved to dismiss the complaint for lack of jurisdiction. The district court granted DOE's motion on November 26, 2024. On December 19, 2024, Plaintiffs filed a motion to alter or amend the judgment under Rule 59, requesting that the district court address 42 U.S.C. § 6306(b)(4) and the Supreme Court's decision in *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), neither of which had been discussed in the court's original opinion. The district court asserted that it had considered all arguments, distinguished *Abbott Laboratories*, but did not further address the meaning of 42 U.S.C. § 6306(b)(4) and denied that motion on May 5, 2025. Plaintiffs timely filed their notice of appeal on May 22, 2025.

## STANDARD OF REVIEW

This Court reviews questions of subject-matter jurisdiction *de novo*. *Houston Refining, L.P. v. United Steel, Paper and Forestry, Rubber, Mfg.*, 765 F.3d 396, 400 (5th Cir. 2014). This Court also reviews *de novo* a district court's determination of controlling law. *Stallworth v. Bryant*, 936 F.3d 224, 229 (5th Cir. 2019) (citing *In Re Avantel, S.A.*, 343 F.3d 311, 318 (5th Cir. 2003)).

## SUMMARY OF ARGUMENT

Plaintiffs seek to vindicate their right to purchase dishwashers and clothes washers that comply with water usage standards set by Congress—not unlawfully restrictive limits imposed by the Department of Energy (DOE). Plaintiffs are currently foreclosed from purchasing these compliant appliances as a direct result of DOE's ultra vires regulations.

DOE contends that Plaintiffs' exclusive avenue of relief lies in a petition for review. But even if successful, such a petition would merely vacate the most recent rules, leaving in place DOE's 2012 standards, which remain more restrictive than those mandated by statute. As a

result, the petition for review process is inadequate: it cannot fully remedy Plaintiffs' injury-in-fact or restore their statutory rights.

Congress expressly preserved alternative avenues for judicial relief. Through a savings clause, 42 U.S.C. § 6306(b)(4), Congress made clear that "[t]he remedies provided for in this subsection shall be in addition to, and not in substitution for, any other remedies provided by law." The Supreme Court, in *Abbott Laboratories v. Gardner*, confirmed this understanding, relying on congressional statements interpreting this statutory language that it was intended to preserve "historical proceeding[s] in equity to enjoin the enforcement of the regulation" and declaratory judgment actions.

That is precisely the relief Plaintiffs seek here: to prevent enforcement of ultra vires regulations and restore their Plaintiffs' rights to the appliance of their choice. The district court failed to recognize its jurisdiction to consider such claims, and its decision should be reversed.

## ARGUMENT

### I.  Plaintiffs Have Standing

Even if not addressed by the parties, this Court has an independent obligation to examine standing *sua sponte* where

necessary. *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331–32 (5th Cir. 2002). DOE challenged Plaintiffs' standing below and presumably continues to maintain that Plaintiffs lack standing. Plaintiffs therefore address standing at the outset.

Plaintiffs assert standing under the "lost opportunity to purchase" doctrine recognized by this Court in *Louisiana v. U.S. Department of Energy*, 90 F.4th 461, 467 (5th Cir. 2024). There, this Court held that "compression in market availability of 'desirable features' represents an injury to participants in the relevant market." *Id.*

At the pleading stage, Plaintiffs need not prove the ultimate merits of their claims; rather, they need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs have directly challenged DOE's authority to impose water use limits on dishwashers and clothes washers. As the complaint makes clear: "Plaintiffs are consumers of consumer appliances that are unlawfully regulated by the Defendant." ROA.17. The complaint further alleges that Plaintiffs are "harmed by these recent direct final rules, because their choice of a preferred clothes washer or dishwasher would be eliminated by these rules." *Id.*

DOE argued below that Plaintiffs failed to identify the "core features" of their preferred appliances or to explain why such products would no longer be available. ROA.391. However, when "reasonable inferences [are] drawn in the light most favorable to the plaintiff," *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005), it is entirely reasonable to infer that Plaintiffs' "preferred clothes washer or dishwasher" eliminated by the rules are those that use the amount of water which Congress established as the legal limit.

Higher water use is a desirable feature for Plaintiffs. As DOE has long acknowledged, reducing water use negatively affects cleaning performance and typically results in longer cycle times. *See* DOE, Final Rule Technical Support Document, ch. 3 at 330 (Nov. 22, 2016), https://www.regulations.gov/document?D=EERE-2014-BT-STD-0021-0029 ("To help compensate for the negative impact on cleaning performance associated with decreasing water use and water temperature, manufacturers will typically increase the cycle time."). Plaintiffs do not wish to sacrifice cleaning performance or endure longer cycles simply to comply with unlawful water restrictions.

At this stage, these allegations are more than sufficient to establish Article III standing to challenge rules that eliminate appliances with these desirable features.

As to appellate standing, a party is aggrieved where a district court decision adversely affects its legal rights. *DeOtte v. State*, 20 F.4th 1055, 1071 (5th Cir. 2021). Here, the district court's decision squarely rejected Plaintiffs' ability to vindicate their rights, satisfying this requirement.

## II. The District Court Possessed Equitable Jurisdiction Over Plaintiff's Claims

The Judiciary Act of 1789 conferred upon federal courts jurisdiction over "all suits ... in equity." 1 Stat. 78, § 11; *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). As the Supreme Court has long recognized, this grant of jurisdiction authorizes courts to administer "the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries." *Id.* (quoting *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939)).

It is a bedrock principle that "[t]he acts of all [agency] officers must be justified by some law," and when an official acts unlawfully to the detriment of an individual, "the courts generally have jurisdiction to grant relief." *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902). Without such relief, individuals would be left "to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Id.* at 110. Accordingly, courts of equity have long recognized their power "to prevent an injurious act by a public officer." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (quoting *Carroll v. Safford*, 44 U.S. 441, 463 (1845)).

"The suits in equity of which the federal courts have had 'cognizance' ever since 1789 constituted the body of law which had been transplanted to this country from the English Court of Chancery." *Guar. Tr. Co. v. York*, 326 U.S. 99, 105 (1945). It is thus necessary to delve into "the principles, rules and usages which belong to courts of equity . . . as contradistinguished from courts of common law." Process Act of 1792, 1 Stat. 275 § 2.

Equitable jurisdiction may be concurrent with, exclusive of, or auxiliary to the jurisdiction of courts of law. 1 Joseph Story, *Commentaries on Equity Jurisprudence* § 33, at 32–33 (1836). In cases such as this—where statutory rights exist but equitable remedies are sought to enforce those rights—equity jurisdiction is concurrent. For such a case, as the Supreme Court noted in *Carroll v. Safford:*

> Why, then, if we rely upon our legal rights, do we ask the interference of equity? We come for the remedy. The most important source of jurisdiction of an equity court is that which is concurrent with courts of law. Rights in each court are the same, but a party is at liberty to ask the aid of a court of equity to protect him in his legal rights on account of the better remedy which results from the modes of administering relief in equity.

*Carroll*, 44 U.S. at 453. "As to the principle on which equity exercises its jurisdiction . . . where legal rights are defined and settled by the rules of law, then equity follows the law." *Id.* at 452.

Here, Plaintiffs invoke a well-established form of equitable relief: the power to enjoin ultra vires agency action. As the Supreme Court reaffirmed earlier this year in *Nuclear Regulatory Commission v. Texas,*

> Before enactment of the APA, those challenging agency action often lacked a statutory cause of action. Yet courts sometimes entertained "a bill in equity to attack administrative action when no statutory review was available." 3 K. Hickman & R. Pierce, Administrative Law §

20.7, p. 2600 (7th ed. 2024). In particular, courts recognized a right to equitable relief where an agency's action was ultra vires—that is, "unauthorized by any law and ... in violation of the rights of the individual." *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902).

145 S. Ct. 1762, 1775 (2025). "The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires.*" *Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002).

Ultra vires equitable review is narrow. It applies "only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. at 1776 (quoting *Railway Clerks v. Association for Benefit of Noncontract Employees*, 380 U.S. 650, 660 (1965)). This form of relief is not concerned with how an agency exercised its authority, but whether it possessed such authority. That standard is plainly met here.

As this Court made clear in *Louisiana v. DOE*, 90 F.4th at 470-72, Congress explicitly limited DOE's authority to regulate water efficiency standards to four enumerated plumbing products: showerheads,

faucets, water closets, and urinals. 42 U.S.C. § 6291(6). DOE's decision to regulate dishwashers and clothes washers thus exceeded its delegated powers and violated a specific statutory prohibition.

Indeed, DOE itself acknowledged that the statutory text "expressly references water use only for four products specifically named." 89 Fed. Reg. 19032, 31406. While DOE has argued that Congress intended to grant broader authority despite this express language, such arguments go to the merits—not to jurisdiction. Plaintiffs' challenge falls squarely within the scope of ultra vires equitable review, as they allege DOE acted "in excess of its delegated powers and contrary to a specific prohibition." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. at 1776. An English court of chancery at the time of the country's founding would have heard Plaintiffs' claims, therefore it qualifies for the equitable jurisdiction of the district court.

Furthermore, under Article III and federal statutory law, the district court possessed subject-matter jurisdiction for two independent reasons. First, Plaintiffs' claims arise under federal law—specifically, the Energy Policy and Conservation Act—thereby satisfying 28 U.S.C. § 1331. Second, this action is a civil suit against an agency of the United

States, providing jurisdiction under 28 U.S.C. § 1346(a)(2). These

jurisdictional grounds were expressly identified in Plaintiffs' complaint.

ROA.7.

Accordingly, the district court possessed equitable jurisdiction

over Plaintiffs' claims. Whether that jurisdiction was implicitly

displaced by 42 U.S.C. § 6306(b)(1) is addressed in the following section.

## III. The Petition-For-Review Remedy Did Not Extinguish Equitable Remedies for Ultra Vires Agency Action.

While nonstatutory equitable remedies historically conferred

jurisdiction on district courts to restrain ultra vires agency action,

Congress may, in appropriate circumstances, channel judicial review

into alternative forums. The district court below concluded that

Congress did so in 42 U.S.C. § 6306(b)(1), which provides for petitions

for review in the courts of appeals. However, as shown below, Congress

neither explicitly nor implicitly divested the district courts of

jurisdiction over the claims Plaintiffs assert here.

Under established precedent, Congress may preclude district court

jurisdiction expressly or by implication. *Bank of La. v. FDIC*, 919 F.3d

916, 923 (5th Cir. 2019). Here, there is no explicit preclusion. To find

explicit preclusion, courts "examine whether 'the text ... expressly

limit[s] the jurisdiction that other statutes confer on district courts.'" *Id.* (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010)). Defendant has never identified, nor does the statute contain, any provision expressly stripping district courts of jurisdiction over equitable ultra vires claims.

Section 6306(b)(1) simply states that "[a]ny person who will be adversely affected by a rule prescribed under section 6293, 6294, or 6295 of this title may . . . file a petition with the United States court of appeals . . . for judicial review of such rule." 42 U.S.C. § 6306(b)(1). While this language authorizes review in the courts of appeals, it does not explicitly foreclose other judicial remedies or divest district courts of jurisdiction. Likewise, § 6306(c) affirmatively grants district courts jurisdiction in certain specified circumstances but does not expressly divest them in others.

Where there is no express preclusion, the question becomes whether Congress implicitly intended to foreclose district court jurisdiction. This requires a "more complex analysis." *Bank of La.*, 919 F.3d at 923. Courts "ask whether it is 'fairly discernible' from the 'text, structure, and purpose' of the statutory scheme that Congress intended

to preclude district court jurisdiction." *Id.* (quoting *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)). If so, courts then inquire whether "the claims at issue are of the type Congress intended to be reviewed within that statutory structure." *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 489).

Plaintiffs do not dispute that § 6306(b)(1) implicitly precludes district court jurisdiction over certain claims challenging appliance standards—particularly those seeking the remedies under the Administrative Procedure Act ("APA"). However, the critical question here is whether Plaintiffs' ultra vires equitable claims are the type Congress intended to channel exclusively into the petition-for-review process. They are not.

Plaintiffs advance two independent reasons why their claims fall outside § 6306(b)(1)'s implied preclusion: First, Congress explicitly preserved equitable remedies in § 6306(b)(4). Second, even apart from that explicit preservation, well-established precedent prevents reading statutes to preclude district court jurisdiction over claims wholly collateral to the statutory review scheme, especially where such claims fall outside agency expertise and would otherwise leave plaintiffs

without meaningful judicial review. That second reason is also supported by the *Leedom v. Kyne* exception which applies in this case.

## A. Congress Explicitly Preserved District Court Equitable Relief in 42 U.S.C. § 6306(b)(4).

The district court erred in concluding that 42 U.S.C. § 6306(b)(1) divested it of jurisdiction. Congress explicitly preserved existing equitable remedies through the savings clause codified in 42 U.S.C. § 6306(b)(4), which states: "The remedies provided for in this subsection shall be in addition to, and not in substitution for, any other remedies provided by law."

When Congress establishes a statutory review scheme designed to channel claims into alternative processes, courts generally presume those procedures to be exclusive. *Free Enter. Fund*, 561 U.S. at 489 (citing *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 420 (1965)). Nevertheless, that presumption does not apply when Congress, as here, explicitly states that new remedies are "in addition to" existing ones.

The text of § 6306(b)(4) is clear. It distinguishes between the "remedies provided for in this subsection"—i.e., the APA-based remedies described in § 6306(b)(2)—and "any other remedies provided

by law." Section 6306(b)(2) grants courts of appeals jurisdiction "to review the rule in accordance with chapter 7 of title 5 and to grant appropriate relief as provided in such chapter." These APA remedies include (1) postponing effective dates of agency action (5 U.S.C. § 705), (2) compelling unlawfully withheld or unreasonably delayed agency action (5 U.S.C. § 706(1)), and (3) setting aside (vacating) agency rules (5 U.S.C. § 706(2)).

By contrast, § 6306(b)(4) ensures that these APA remedies are "in addition to" and not "in substitution for" other remedies, including equitable claims for injunctive and declaratory relief against ultra vires agency action. The phrase "in addition to" signals an intent to supplement—not supplant—existing forms of relief. And "not in substitution for" confirms that Congress did not intend the petition-for-review mechanism to operate as an exclusive bar against other judicial avenues.

As discussed in Argument II above, nonstatutory ultra vires equitable relief has long been recognized as an "other remedy provided by law," traceable to English chancery practice and historically available in federal courts. Congress's inclusion of a broad savings

clause thus explicitly rebuts any argument for implicit preclusion of these equitable claims.

Accordingly, § 6306(b)(4) preserves district court jurisdiction to adjudicate equitable claims challenging agency action taken wholly in excess of statutory authority and contrary to a specific statutory provision.

1. *The text of 42 U.S.C. § 6306(b)(4) explicitly preserves existing equitable remedies.*

Analysis of § 6306(b)(4) begins, as always, with the statutory text: "The remedies provided for in this subsection shall be in addition to, and not in substitution for, any other remedies provided by law." 42 U.S.C. § 6306(b)(4).

The phrase "remedies provided for in this subsection" refers to the remedies set forth in § 6306(b)(2), which grants the courts of appeals "jurisdiction to review the rule in accordance with chapter 7 of title 5 and to grant appropriate relief as provided in such chapter." 42 U.S.C. § 6306(b)(2). Chapter 7 of title 5 codifies the Administrative Procedure Act ("APA") remedies, which include: (1) the power to postpone the effective date of an agency action pending judicial review, 5 U.S.C. § 705; (2) authority to compel agency action unlawfully withheld or

unreasonably delayed, 5 U.S.C. § 706(1); and (3) the power to set aside or vacate agency action, 5 U.S.C. § 706(2). It is these specific APA remedies that § 6306(b)(4) identifies as "the remedies provided for in this subsection."

The concluding clause of § 6306(b)(4)—"any other remedies provided by law"—refers to other previously existing judicial review remedies. The term "other" unmistakably distinguishes preexisting equitable remedies from the APA specific remedies enumerated in § 6306(b)(2). As discussed above in Section II, longstanding equitable remedies, such as declaratory and injunctive relief against ultra vires action, fall squarely within this category of "other remedies provided by law." Those equitable remedies may not be the only remedies that fit within this description, but they are included among them.

The middle phrase—"shall be in addition to, and not in substitution for"—makes clear that these APA-based remedies do not displace other existing judicial review remedies. "In addition to" signifies augmentation rather than replacement; it reflects Congress's intent to preserve, not supplant, preexisting remedies. Likewise, "not in substitution for" confirms that Congress did not intend the APA

remedies to serve as an exclusive alternative, but rather as a parallel, supplemental mechanism.

Thus, while § 6306(b)(1) channels challenges seeking APA relief to the courts of appeals, § 6306(b)(4) explicitly preserves the availability of non-statutory equitable remedies in district court. This textual safeguard reverses the usual presumption that a specialized review scheme implicitly precludes other forms of judicial review.

By its plain terms, § 6306(b)(4) confirms that the equitable remedies Plaintiffs seek—declaratory and injunctive relief against agency action exceeding statutory authority—remain fully available and enforceable in district court.

> 2. *The Supreme Court in* Abbott Laboratories v. Gardner *makes clear that the statutory language in 42 U.S.C. § 6306(b)(4) preserves existing equitable remedies.*

Not only does the text of § 6306(b)(4) preserve traditional equitable remedies, but Supreme Court precedent—in particular, *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)—squarely support this interpretation.

While the Supreme Court has not construed § 6306(b)(4) directly, it has interpreted nearly identical statutory language in *Abbott*

*Laboratories*. There, the Court examined § 701(f) of the Food, Drug, and Cosmetic Act, codified at 21 U.S.C. § 371(f)(6), which provides: "The remedies provided for in this subsection shall be in addition to and not in substitution for any other remedies provided by law."

That language is materially identical to § 6306(b)(4), which states: "The remedies provided for in this subsection shall be in addition to, and not in substitution for, any other remedies provided by law."

In *Abbott Laboratories*, pharmaceutical manufacturers sought pre-enforcement declaratory and injunctive relief, arguing that the FDA had exceeded its statutory authority. 387 U.S. at 139. The Supreme Court rejected the government's argument that the statutory review provision foreclosed district court jurisdiction. The Court noted that Congress had provided no "explicit statutory authority" precluding pre-enforcement review. *Id*. at 141. The same is true here: § 6306(b)(1) contains no express prohibition on pre-enforcement equitable relief.

Moreover, the *Abbott* Court emphasized that "[t]here is no evidence at all that members of Congress meant to preclude traditional avenues of judicial relief." *Id*. at 142. The "traditional avenues" referenced included precisely the remedies Plaintiffs seek here —

declaratory and injunctive relief to restrain ultra vires agency action.

*Id.* at 139 ("The District Court ... granted the declaratory and injunctive

relief sought.").

Congress's intent to preserve these traditional remedies was

further reinforced by legislative history quoted in *Abbott*:

> There is always an appropriate remedy in equity in cases
> where an administrative officer has exceeded his authority
> and there is no adequate remedy of law, . . . [and that]
> protection is given by the so-called Declaratory Judgments
> Act.

*Id.* at 142 (quoting H.R. Rep. No. 2755, 74th Cong., 2d Sess., 8).

The principle of *Abbott* is no different here. While DOE claims to

act under § 6295, the challenged rules are not rules prescribed under

§ 6295, they are outside any authority granted by Congress to the

agency. Jurisdiction does not hinge on the agency's characterization of

its own authority; it turns on text Congress enacted. Because these

rules do not qualify as "a rule prescribed under section 6293, 6294, or

6295" within the meaning of § 6306(b)(1), they are not confined to the

appellate review mechanism.

In a separate but complementary holding, the Court analyzed the

statutory "savings clause"—language identical to § 6306(b)(4). It

described the clause as "bear[ing] heavily on the issue" and noted that, taken at face value, it "would foreclose the Government's main argument" that only the special statutory review procedure was available. *Id*. at 144. The savings clause was understood to have "saved as a method to review a regulation ... whatever rights exist to initiate a historical proceeding in equity to enjoin the enforcement of the regulation, and whatever rights exist to initiate a declaratory judgment proceeding." *Id*. at 145 (quoting H.R. Rep. No. 2139, 75th Cong., 3d Sess., 11).

One difference identified by the Defendant is that, as a procedural safeguard, one Plaintiff, Mr. Daquin, filed a protective petition for review in the Fifth Circuit. *Daquin v. DOE*, Docket No. 24-60316. He expressly noted that he preserved this petition solely to maintain access to judicial review if this Court were to find that § 6306(b)(1) provided the exclusive avenue for relief. *See* Docket No. 24-60316, ECF No. 1. This protective measure does not alter the merits of Plaintiffs' claim to equitable jurisdiction in district court.

Finally, *Abbott Laboratories*, though decided under the Food, Drug, and Cosmetic Act, is directly instructive here. EPCA was enacted

eight years after *Abbott Laboratories*, and it is a settled interpretive canon that when Congress borrows language from an earlier statute, it is presumed to adopt the settled judicial construction of that language. *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'") (quoting *Hall v. Hall*, 584 U.S. 59, 66 (2018)). The near identical language of 21 U.S.C. § 371(f)(6) and 42 U.S.C. § 6306(b)(1) provides substantial evidence demonstrating that Congress transplanted the language of the former to the latter.

"It is ... well established that [w]here Congress uses terms that have accumulated settled meaning ... a court must infer, unless the statute otherwise dictates, that Congress meant to incorporate the established meaning of these terms." *Field v. Mans*, 516 U.S. 59, 69 (1995) (alteration in original).

Justice Gorsuch recently applied *Abbott Laboratories* and this same statutory language as 42 U.S.C. § 6306(b)(4), writing:

> If all that were not enough, there is more. A neighboring statutory provision says that "the rights and remedies" the Exchange Act authorizes "shall be in addition to any and all other rights and remedies that may exist at law or in equity." § 78bb(a)(2). This Court has explained that a "saving clause" of this sort "strongly buttresse[s]" the conclusion that

a review provision such as § 78y(a)(1) does not preclude "traditional avenues of judicial relief." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 142, 144 (1967). And, of course, one traditional avenue of relief is a suit in district court under § 1331 seeking to enjoin unconstitutional conduct. See *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 491, n. 2, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). Far from barring Ms. Cochran's path to court, then, the Exchange Act expressly preserves it.

*Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 210 (2023)

(Gorsuch, J., concurring).

In its reply brief below, Defendant asserted—and the district court improperly accepted—that *Natural Resources Defense Council v. Abraham*, 355 F.3d 179 (2d Cir. 2004), rather than *Abbott Laboratories*, provides the proper analytical framework. ROA.440. Defendant contends that *Abraham* rejected district court jurisdiction based on "the same 'savings clause' argument (Opp'n 6, 8–9) that Plaintiffs raise here." *Id.* That assertion is incorrect.

The Second Circuit in *Abraham* did not address the savings clause in 42 U.S.C. § 6306(b)(4) at all. 355 F.3d 179. While the district court in *New York v. Abraham*, 199 F. Supp. 2d 145 (S.D.N.Y. 2002), briefly mentioned the provision, its only substantive remark was that "[i]t is unclear what purpose the savings clause serves in section 6295." *Id.* at

151. From there, the court simply defaulted to a general interpretive presumption, without conducting meaningful statutory analysis. *Id.* The presumption, which this Court has not adopted, derives from a statement of the Seventh Circuit that "[i]f there is any ambiguity as to whether jurisdiction lies with a district court or with a court of appeals we must resolve that ambiguity in favor of review by a court of appeals." *Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186, 192 (7th Cir. 1986). The court did not explain why the ambiguity must be resolved in favor of a court of appeals particularly with regard to an original matter. That cursory treatment falls far short of the kind of interpretive rigor this Court should find persuasive. Critically, the savings clause issue was not raised on appeal, and the Second Circuit's decision in *Abraham* offers no precedent on this issue.

Congress is presumed to have been fully aware of *Abbott Laboratories* and the Court's interpretation of its savings clause when it adopted § 6306(b)(4). That presumption confirms Congress's intent to preserve preexisting equitable remedies alongside the appellate review mechanism.

*3. Section 6306(b)(4) preserves both equitable remedies and their corresponding equitable cause of action and jurisdiction.*

An equitable remedy cannot exist in a vacuum; it necessarily presupposes the existence of a corresponding equitable cause of action and judicial forum. Defendant erroneously contends that § 6306(b)(4) "merely preserves remedies other than those available under EPCA" and thus "does nothing to preserve alternative causes of action or grants of jurisdiction." ROA.389. This argument fundamentally misunderstands the meaning of "remedies," the nature of equitable relief, and the historical foundation of equitable jurisdiction.

As a threshold matter, the term "cause of action" is used in two distinct senses. The first is the pleading sense, referring to a formal legal theory with specific elements that, if established, entitle a party to relief — the traditional "form of action" or writ at common law. In equity, however, there was never a rigidly defined "cause of action" in this sense. Instead, equity recognized certain "heads of jurisdiction," under which courts would grant relief where no adequate remedy at law existed. *See* Eugene A. Jones, *Manual of Equity Pleading and Practice* 31 (1916) ("[T]he plaintiff's narrative of his grievance . . . must state a case remediable under some head of equity jurisdiction."); Joseph H.

Koffler & Alison Reppy, *Handbook of Common Law Pleading* 20–21 (1969). Among these recognized heads is the ultra vires doctrine, which allows litigants to enjoin government action that exceeds statutory authority.

The second sense of "cause of action" concerns legal entitlement to sue—that is, whether a plaintiff has authority to invoke judicial relief. In law, such causes of action generally require statutory authorization. In contrast, equitable causes of action arise independently of statute, as courts of equity historically proceeded upon the equities of the controversy without reference to legislatively conferred causes of action.

> After Congress created federal question jurisdiction in 1875, federal courts began entertaining bills of equity that sought to enjoin allegedly unlawful administrative action. They did so on the theory that federal courts needed only a grant of jurisdiction, not a statutory cause of action.

Thomas W. Merrill, Article III, *Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939, 949 (2011).

The creation of a specific judicial review remedy in § 6306(b)(1) might, as a default matter, be read to implicitly displace preexisting equitable remedies and jurisdiction. *See Axon Enter., Inc. v. FTC*, 598

U.S. 175, 185 (2023) ("[T]he creation of a review scheme for agency action divests district courts of their ordinary jurisdiction over the covered cases."). However, courts must still determine whether it is "fairly discernible" from the statutory "text, structure, and purpose" that Congress intended to preclude district court jurisdiction over particular claims. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012).

Here, § 6306(b)(4) serves as a textual rebuttal to any presumption of implied preclusion. By expressly stating that "[t]he remedies provided for in this subsection shall be in addition to, and not in substitution for, any other remedies provided by law," Congress preserved the preexisting equitable cause of action and the corresponding district court jurisdiction.

Thus, by preserving existing remedies, Congress avoided the implicit removal of those remedies' jurisdiction and the cause of action. This reflects the same presumption—that jurisdiction and cause of action follow the remedy—applied here to the retention of existing remedies rather than the creation of new ones.

Indeed, the Supreme Court overturned this Court to reject the fundamental anomaly that would result if remedies for ultra vires

claims were presumed to have been transferred to the courts of appeals.

As the Supreme Court explained earlier this year,

> Also, Texas and Fasken's theory of ultra vires review would lead to major anomalies. For example, the Fifth Circuit purported to exercise original—rather than appellate— jurisdiction over these ultra vires claims. But as counsel for Fasken acknowledged at oral argument, no precedent supports bringing an ultra vires claim in a court of appeals in the first instance, rather than in a district court.

*Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025).

Defendant's narrow reading of § 6306(b)(4) also conflicts with the implicit holding of *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967). There, as discussed above, the Supreme Court recognized and preserved the right of plaintiffs to bring ultra vires actions in equity notwithstanding the existence of a statutory review scheme. *Abbott Laboratories* demonstrates that equitable remedies, including declaratory and injunctive relief, and their corresponding equitable cause of action and jurisdiction, remain available.

In short, Defendant's argument not only misconstrues the historical foundation of equitable review but is also foreclosed by binding precedent of that statutory language. Section 6306(b)(4)

explicitly preserves the preexisting equitable cause of action and the jurisdiction of district courts to hear such claims.

**B. Plaintiffs' Claims Are Not of the Type Congress Intended to Be Exclusively Reviewable Under Only § 6306(b)(1).**

Even setting aside Congress's explicit preservation of jurisdiction in § 6306(b)(4), a separate and independent inquiry remains: whether the claims at issue are of the type Congress intended to be exclusively channeled through § 6306(b)(4). *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010).

The Supreme Court has articulated three familiar factors to determine congressional intent in this context: courts "presume that Congress does not intend to limit [district court] jurisdiction [1] if a finding of preclusion could foreclose all meaningful judicial review; [2] if the suit is wholly collateral to a statute's review provisions; and [3] if the claims are outside the agency's expertise." *Id.* at 489. (internal quotation marks removed). Plaintiffs' claims satisfy each of these factors, confirming that Congress did not intend for their ultra vires challenges to be funneled exclusively through § 6306(b)(1).

1. *To Limit District Court Jurisdiction, the Claims at Issue Must Be of the Type Congress Intended to Be Exclusively Reviewed Using That Statutory Scheme.*

At the outset, Defendant below contended that these factors were not relevant, asserting that "[t]he only question, therefore, is whether that vesting is exclusive." ROA.436. Defendant's supposition is that *all* actions regarding the agency fall within any exclusive statutory scheme regardless of the scope of claims Congress intended to be channeled. This argument misreads Supreme Court precedent and fails to accurately describe the governing framework.

The Supreme Court has made clear that the threshold question is whether Congress intended to channel the particular claims at issue, not any claims, exclusively through the statutory scheme. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023). Stripping jurisdiction based solely on a mechanical notion of "vesting" of all jurisdiction ignores the governing framework, which demands a careful analysis of congressional intent and the nature of the claims asserted. Defendant's approach would impermissibly bypass that inquiry and undermine the carefully calibrated balance established.

Although first established in *Thunder Basin*, the Supreme Court has applied these factors in many contexts concerning special statutory review schemes to determine congressional intent to strip district court jurisdiction. Those factors are: that courts "presume that Congress does not intend to limit [district court] jurisdiction [1] if a finding of preclusion could foreclose all meaningful judicial review; [2] if the suit is wholly collateral to a statute's review provisions; and [3] if the claims are outside the agency's expertise." *Free Enter. Fund*, 561 U.S. at 489 (internal quotation marks removed).

Defendant rejects that these factors are relevant and claims the proper review "is governed by a separate line of precedent, of which the seminal case is *Telecommunications Research & Action Center v. Federal Communication Commission*, 750 F.2d 70, 77 (D.C. Cir. 1984)." ROA.436. Defendant's assertion that the factors derived from *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), do not apply is without support. Defendant further claims that § 6306(b)(1) is not a "special statutory review scheme." ROA.436. Defendant cites *Axon Enter. Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023), as the basis for this

claim, but the Supreme Court in *Axon* described it in materially different terms.

In *Axon*, the Supreme Court reiterated that "District courts may ordinarily hear those challenges [to federal agency action] by way of 28 U.S.C. § 1331's grant of jurisdiction for claims 'arising under' federal law." *Axon*, at 598 U.S. at 185. In other words, that is the default (or ordinary) statutory review scheme as opposed to any special one. Then the Court notes, "Congress, though, may substitute for that district court authority an alternative scheme of review." *Id.* These alternative schemes of review are special statutory review schemes. Based on its incorrect interpretation of *Axon*, Defendant asserts that "EPCA imposes no 'special statutory review scheme' within the meaning of *Thunder Basin*" and asserts specifically that § 6306(b)(1) is not such a "special statutory review scheme." ROA.436.

Evidently, Defendant thinks the proper review "is governed by a separate line of precedent, of which the seminal case is *Telecommunications Research & Action Center v. Federal Communication Commission*, 750 F.2d 70, 77 (D.C. Cir. 1984)." ROA.436. But that argument misconstrues both the precedent in the

allegedly seminal case of *Telecommunications Research & Action Center* (TRAC) and the statutory framework.

In *TRAC*, the D.C. Circuit addressed the FCC's delay in acting on a petition regarding rate regulation under its ratemaking authority—an agency adjudicatory process. Far from excluding the *Thunder Basin* analysis as lacking a special statutory review scheme, *TRAC* describes circuit court review in that case as a "special review statute," drawing language directly from the APA's reference to "special statutory review proceedings." *See Telecommunications Research & Action Center*, 750 F.2d 70, 77–78 & n.34 (D.C. Cir. 1984) (quoting 5 U.S.C. § 703). Indeed, *Axon* later confirmed that the terms "special statutory review proceeding" and "special statutory review scheme" are used interchangeably. *Axon*, 598 U.S. at 211 n.3.

Section 6306(b)(1) is precisely such a "special statutory review proceeding" within the meaning of § 703 of the APA or a "special statutory review scheme" under *Thunder Basin*. Under § 703, where a "special statutory review proceeding" exists, venue is typically in the court specified by statute (here, the courts of appeals). Yet "in the absence or inadequacy thereof," § 703 also contemplates an alternative:

the form of review can be "any applicable form of legal action, including actions for declaratory judgments or for writs of prohibitory or mandatory injunction, or habeas corpus, in a court of competent jurisdiction." 5 U.S.C. § 703. As demonstrated below in Subsection B, review under § 6306(b)(1) is inadequate for Plaintiffs' claims. That inadequacy requires recourse to a district court jurisdiction which has jurisdiction over these claims.

Defendant also misplaces reliance on *JTB Tools & Oilfield Services, L.L.C. v. United States*, 831 F.3d 597 (5th Cir. 2016), claiming it supports their position. In *JTB Tools*, this Court considered "whether this court is vested with exclusive jurisdiction to conduct judicial review over health and safety standards that the Secretary has declined to issue." *Id.* at 599. Although this Court didn't reference *Thunder Basin*, it answered the questions that precedent requires.

The first question this Court answered in *JTB Tools* was whether "the 'text, structure, and purpose' of the statutory scheme that Congress intended to preclude district court jurisdiction." *Bank of La. v. FDIC*, 919 F.3d 916, 923 (5th Cir. 2019). The Court in *JTB Tools* examined 29 U.S.C. § 655(f) and found that "the plain text of the statute grants

exclusive jurisdiction to courts of appeals for standards issued by the Secretary." *JTB Tools*, 831 F.3d at 599. The statute in *JTB Tools* had nothing similar to 42 U.S.C. § 6306(b)(4) as a textual basis to suggest that there was any other intention by Congress.

The second question under *Thunder Basin* is "whether the claims at issue are of the type Congress intended to be reviewed within th[e] statutory structure." *Bank of La.*, 919 F.3d at 923. This Court in *JTB Tools* examined whether the decision to refuse to issue a rule is the type of issue that Congress intended to be exclusively reviewed under the 29 U.S.C. § 655(f). This Court found that when reading § 655(f), "in conjunction with the APA," that when a statute provides "exclusive jurisdiction to a particular court to review past actions of an agency, that court necessarily has the exclusive jurisdiction to review inaction as well." *JTB Tools*, 831 F.3d at 600.

None of the other factors from *Thunder Basin* were anywhere close to applying, and there was no argument from the petitioner that they did. In *JTB Tools*, the petitioner presented no argument that their claims were wholly collateral to the statutory scheme, or that the statutory review process was inadequate, or that the issues lay beyond

the agency's expertise. To the contrary, the petitioner was afforded an opportunity to present arguments in the court of appeals but waived those claims on the merits. *Id.* at 601.

As the Supreme Court has consistently held, the fundamental inquiry is whether the "claims at issue are of the type Congress intended to be reviewed within th[e] statutory structure." *Free Enter. Fund*, 561 U.S. at 489 (internal quotation marks omitted). While Congress may explicitly strip district courts of all jurisdiction, where Congress acts only implicitly, the presumption against jurisdictional stripping is overcome only where it is "fairly discernible" from the statute's text, structure, and purpose. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012).

Here, nothing in EPCA's text or structure suggests that Congress intended to preclude district courts from entertaining ultra vires challenges, particularly where Plaintiffs would otherwise be without meaningful judicial review and the claims do not implicate agency expertise. Instead, as described above, § 6306(b)(4) expressly preserves these avenues of relief.

In short, Defendant's attempt to circumvent the *Thunder Basin* factors fails. As shown below, Plaintiffs' claims are not of the type Congress intended to funnel exclusively into the statutory review scheme of § 6306(b)(1), and district court jurisdiction thus remains intact.

> 2. *Section 6306(b)(1) Does Not Provide Plaintiffs with Meaningful Judicial Review of Their Harms.*

The first *Thunder Basin* factor asks whether precluding district court jurisdiction "could foreclose all meaningful judicial review." *Thunder Basin*, 510 U.S. at 212–13. As the Supreme Court made clear in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), it is not enough for Congress to provide any path to a court; the review must be truly meaningful. And here, it is manifestly not.

This Court has held that a judicial review scheme where the Plaintiff is "left unable to seek redress for the injury" would not provide "meaningful judicial review." *See Cochran v. U.S. Sec. & Exch. Comm'n*, 20 F.4th 194, 209 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023). To analyze this question requires examining the injury that Plaintiffs assert and

determining whether it could possibly be remedied by the judicial review scheme in 42 U.S.C. § 6306(b)(1).

Plaintiffs' core injury is not confined to the 2024 rules alone. Plaintiffs assert that DOE lacks authority to impose any appliance water limits that override the water use limits Congress specifically set. Their injury is ongoing, concrete, and irreparable: the permanent elimination of the ability to purchase dishwashers and clothes washers compliant with statutory limits. ROA.17; Complaint ¶ 43. The harm does not vanish merely by setting aside the latest rule; it persists so long as DOE maintains and enforces its ultra-vires regulatory scheme.

Section 6306(b)(1) does not address this injury. Section 6306(b)(1) would only allow a challenge to new "rules" and only grants the remedy of vacatur of that particular action under the APA. 42 U.S.C § 6306(b)(2);5 U.S.C. § 706(2). But vacating one discrete rule merely resets the agency's standards to prior illegal standards and it does not prevent DOE from issuing materially identical ultra vires rules tomorrow. Thus, it offers no guarantee of compliance with the statutory limits Congress set, nor any binding constraint on DOE's future misconduct.

In other words, § 6306(b)(1) only allows Plaintiffs to play an endless game of regulatory "whack-a-mole," challenging each new unlawful rule as it comes, without ever securing final relief against the agency's broader assertion of illegal authority. This is the precise scenario *Free Enterprise Fund* condemned as not meaningful. The Supreme Court warned that forcing parties to challenge piecemeal rules under such a scheme fails to provide meaningful judicial review—especially "because only new rules, and not existing ones, are subject to challenge." *Free Enterprise Fund*, 561 U.S. at 490.

The equitable relief Plaintiffs seek—declaratory and injunctive relief—directly addresses both current and future harm by stripping DOE of the authority it lacks and binding it to the limits Congress enacted. By contrast, review under § 6306(b)(1) cannot secure this relief. It addresses only the legality of individual rules, after the fact, and never the agency's ongoing ultra vires power grab.

Nor can DOE's empty assurances about future compliance be credited. Agencies are normally presumed to obey not only final judgments, but also appellate opinions. But here, DOE has already shown its willingness to disregard this Court's prior rulings, confirming

that equitable relief is not just appropriate but necessary. Vacating a single rule today does nothing to stop DOE from issuing a materially identical unlawful rule tomorrow.

Finally, the government's assertion that § 6306(b)(1) provides meaningful review simply because "anyone 'adversely affected' by an EPCA final rule may petition for judicial review in the relevant circuit court," ROA.422, misstates the law and ignores controlling precedent. The Supreme Court in *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, recently rejected this view that "presumption of judicial review does not apply unless a statute would preclude *all* judicial review." 145 S. Ct. 2006, 2016 n.4 (2025). Instead, the Court emphasized that the presumption of judicial review applies to "statutes that may limit *or* preclude review." *Id.* (citing *Cuozzo Speed Technologies, LLC v. Lee*, 579 U.S. 261, 273 (2016)) (emphasis added in *McLaughlin*).

Put simply, forcing Plaintiffs into § 6306(b)(1) review would deny them any meaningful opportunity to remedy their core injuries and prevent future violations. It would reduce their rights to a hollow

procedural formality—contrary to the Supreme Court's repeated

insistence on real, effective judicial review.

Accordingly, Plaintiffs are entitled to pursue equitable relief in

district court. Only such relief can provide the meaningful, forward-

looking remedy necessary to prevent DOE's continued ultra vires

actions and to protect Plaintiffs from ongoing and future harm.

### 3. Plaintiffs' Claims Are Wholly Collateral to the Statutory Review Provisions

The second *Thunder Basin* factor—whether the claims are "wholly

collateral to [the] statute's review provisions," *Thunder Basin*, 510 U.S.

at 212—decisively supports Plaintiffs here. Indeed, this case epitomizes

the precise type of structural, collateral challenge that the Supreme

Court has repeatedly held remains accessible in district courts.

As the Supreme Court explained just last year in *Axon Enterprise,*

*Inc. v. FTC*, 598 U.S. 175 (2023), and previously in *Free Enterprise*

*Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477

(2010), a claim is "wholly collateral" where it does not attack the

agency's exercise of power in a particular case, but rather challenges

the agency's power itself. In *Axon*, the Court emphasized that the

parties' claims were collateral because they "object[ed] to the

Commissions' power generally, not to anything particular about how that power was wielded." *Axon*, 598 U.S. at 193. The claims did not concern "procedural or evidentiary matters" or involve questions "the agency often resolves." *Id*. Instead, they struck at the heart of the agency's very authority to act.

That is exactly the situation here. Plaintiffs do not merely quarrel with DOE's technical standards for dishwashers or clothes washers. They do not allege DOE improperly weighed evidence, applied incorrect efficiency metrics, or overlooked specific data in crafting its latest rule. Plaintiffs instead raise a frontal, categorical challenge to DOE's power: the agency has no lawful authority to override the explicit statutory water-use limits set by Congress for dishwashers or clothes washers.

Plaintiffs' claims are thus not mere quibbles about the means by which DOE has exercised its regulatory discretion; they are a direct attack on DOE's fundamental ability to act at all in this sphere. Plaintiffs seek to vindicate Congress's exclusive prerogative to set national policy on appliance water use—not to relitigate agency factfinding or technical judgments.

Moreover, the relief sought underscores the collateral nature of these claims. Plaintiffs seek a declaration that DOE lacks statutory authority to promulgate these efficiency standards and an injunction prohibiting DOE from enforcing or promulgating such rules now or in the future. This relief does not merely invalidate one isolated rule; it addresses the structural overreach of the agency itself.

The agency's conduct only strengthens Plaintiffs' case for collateral review. DOE ignoring of this Court's opinions in *Louisiana v. DOE* and confining Plaintiffs to a procedural hamster wheel under § 6306(b)(1)—forced to challenge each new rule individually, after the fact—does not address the root problem: DOE's ongoing assertion of unlawful authority.

In sum, Plaintiffs' claims are the quintessential example of "wholly collateral" challenges—attacking the agency's assertion of power at its foundation rather than the particulars of any single rulemaking. Under the second *Thunder Basin* factor, Plaintiffs are entitled to proceed in district court and obtain meaningful, comprehensive relief that cannot be achieved through the limited and inadequate statutory review process.

*4. Plaintiffs' Claims Fall Entirely Outside the Agency's Expertise*

The third Thunder Basin factor—whether the claims are "outside the agency's expertise"—unmistakably supports Plaintiffs here. *Thunder Basin*, 510 U.S. at 212. The Supreme Court has emphasized repeatedly that questions of law—especially fundamental questions about an agency's statutory authority—are presumed to be the province of Article III courts.

Most recently, in *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), the Supreme Court made clear that challenges raising "standard questions of administrative and constitutional law, detached from considerations of agency policy," lie far outside any agency's putative "expertise." *Id.* at 194 (quoting *Free Enterprise Fund*, 561 U.S. at 491). Put plainly, when the dispute concerns whether an agency has the lawful power to act at all—as opposed to how it exercises that power— there is no role for technical know-how, scientific modeling, or discretionary policy balancing that are the core of the agency's authority.

Here, Plaintiffs do not quarrel with DOE's engineering models, cost analyses, or efficiency calculations. They do not contest DOE's

appliance test procedures, data sampling, or forecasting. Instead, Plaintiffs mount a frontal attack on DOE's authority itself: Congress— not DOE—established mandatory water use limits, and DOE has no statutory license to discard or rewrite them. The legal question is binary and foundational: did Congress authorize DOE to regulate the water limits of these appliances at all?

Under our Constitution's design, resolving such pure legal questions is the exclusive province of Article III courts. These are precisely the "standard questions of administrative law" that "fall more naturally into a judge's bailiwick" rather than an agency's. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2247 (2024) (quoting *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019)). Indeed, as *Loper Bright* reaffirmed, any persuasive value of the agency arises only "to the extent [they] rest[] on factual premises within [the agency's] expertise." 144 S. Ct. at 2267. Here, there are no technical or scientific predicates at issue—only the text and structure of the statute, a domain presumed to be within the district court's authority.

Moreover, requiring Plaintiffs to channel their claims through the § 6306(b)(1) review scheme would improperly replace the district court's

place as the initial adjudicator of what the law is with that of the agency. Under that scheme, DOE effectively "replaces" the district court as the initial collector of evidence and initial decider of threshold legal issues, with the court of appeals relegated to reviewing an administrative record crafted by the agency. Such displacement of the district court's core function—particularly for claims going to the heart of an agency's power—is precisely what the Supreme Court in *Axon* said cannot be presumed of Congress. 598 U.S. at 194. When a litigant "object[s] to the [agency's] power generally, not to anything particular about how that power was wielded," the claim is inherently outside the agency's purview and should be presumed available for district court jurisdiction. *Axon*, 598 U.S. at 193.

In sum, Plaintiffs' claims rest not on contested facts or technical agency judgments, but on pure, threshold questions of statutory authority—questions that federal courts, not agencies, are presumed to be tasked to answer by Congress. The third *Thunder Basin* factor therefore powerfully supports district court jurisdiction.

### 5. *The Leedom v. Kyne Exception Further Confirms District Court Jurisdiction*

While Plaintiffs have already demonstrated that district court jurisdiction exists based on both the explicit preservation in 42 U.S.C. § 6306(b)(4) and the controlling *Thunder Basin* factors, the well-established exception recognized in *Leedom v. Kyne*, 358 U.S. 184 (1958), provides an additional basis supporting district court review in this case.

The *Kyne* exception applies even where statutory text would otherwise preclude district court jurisdiction. As the Fifth Circuit has recognized, *Kyne* is not merely a last resort; it is a critical safeguard that operates even where "statutory language precludes jurisdiction." *Kirby Corp. v. Pena*, 109 F.3d 258, 268 (5th Cir. 1997). This narrow but potent exception exists precisely to prevent agencies from acting in a way that "exceeds the scope of its delegated authority or violates a clear statutory mandate." *Id.* at 268.

The rationale is straightforward: when an agency so clearly exceeds the limits of its statutory authority—when it acts ultra vires in a manner so egregious that it strikes at the heart of its statutory constraints—courts must retain the power to intervene. As the Fifth

Circuit emphasized, the *Kyne* exception is designed for situations where the agency action is "of a summa or magna quality," transcending ordinary legal error as to how an agency exercises its power and goes to the heart of agency authority. *Id*. at 269.

That is precisely the posture here. Plaintiffs do not contest DOE's technical judgments or factual findings; they challenge DOE's very claim to power—its audacious assertion that it can override explicit statutory constraints imposed by Congress on appliance water limits. This is not a case of misapplied discretion or minor interpretive error; it is a direct, wholesale usurpation of legislative authority. Indeed, DOE's actions here are in direct defiance of this Court's recent decision in *Louisiana v. DOE*, 90 F.4th at 470-72, further underscoring the extraordinary nature of its lawlessness.

In such extraordinary circumstances, *Leedom v. Kyne* squarely authorizes district court jurisdiction to prevent agencies from shielding ultra vires acts behind procedural barriers. Here, if Plaintiffs were forced into the limited statutory review under § 6306(b)(1), they would be left without any meaningful opportunity to remedy their injury.

Furthermore, the *Kyne* exception reinforces the force of the *Thunder Basin* analysis. While *Thunder Basin* asks whether Congress intended to strip district court jurisdiction implicitly of these claims, *Kyne* asks a logically subsequent and even more stringent question: does the agency action so clearly transgress statutory bounds that district court jurisdiction is necessary? In this case, the answer is unequivocally yes. That inquiry reinforces the critical need to assess the *Thunder Basin* factor of whether the challenged claims are wholly collateral when determining the proper bounds of district court jurisdiction under a special statutory review proceeding like § 6306(b)(1).

In short, the *Leedom v. Kyne* exception confirms what the text, structure, and precedent already make clear: Plaintiffs' claims must be heard in district court. DOE's defiance of express statutory limits and its open disregard for this Court's precedent constitute precisely the type of agency overreach that *Kyne* envisioned and was designed to check.

Thus, even if this Court were to conclude that § 6306(b)(1) creates an exclusive review channel for these claims—and it does not—the *Kyne*

exception decisively recognizes that district court jurisdiction is preserved to address Plaintiffs' claims and to halt DOE's manifestly unlawful exercise of power.

*    *    *

Plaintiffs' claims fall squarely within the core district court jurisdiction long recognized by this Court and the Supreme Court for equitable ultra vires challenges. Congress did not silently strip district courts of jurisdiction to adjudicate such fundamental questions of agency authority, particularly where Congress explicitly preserved such remedies in 42 U.S.C. § 6306(b)(4).

The text, structure, and purpose of EPCA confirm that Plaintiffs' claims are not the type Congress intended to funnel exclusively through the statutory review scheme of § 6306(b)(1). Plaintiffs' claims are precisely the sort of challenges that are entitled to meaningful district court review because they attack the agency's power at its root. They are wholly collateral to the statute's review provisions, raise purely legal issues far outside the agency's policy expertise, and without district court jurisdiction, Plaintiffs would be deprived of any meaningful avenue to vindicate their rights.

Moreover, the Supreme Court's decision in *Abbott Laboratories* and more recently *Axon*, *Free Enterprise Fund*, and *Nuclear Regulatory Commission v. Texas* powerfully reinforce the presumption in favor of preserving traditional equitable relief in district court, ensuring that agencies remain within the limits set by Congress and that private parties are not forced to endure ultra vires agency action without redress.

DOE's unlawful attempt to regulate in defiance of clear statutory constraints, as directly interpreted by this Court in *Louisiana v. DOE*, directly harms Plaintiffs today and threatens continued harm tomorrow. The district court's jurisdiction is both proper and necessary to provide complete relief and to safeguard Congress's authority.

## CONCLUSION

For the foregoing reasons, this Court should reverse the dismissal below and remand with instructions to proceed to the merits of Plaintiffs' claims for declaratory and injunctive relief.


Dated: August 4, 2025        Respectfully submitted,

                           /s/ *Devin Watkins*

                           Devin Watkins
                           COMPETITIVE ENTERPRISE INSTITUTE
                           1310 L Street NW, 7th Floor
                           Washington, DC 20005
                           (202) 331-1010
                           devin.watkins@cei.org

                           *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I, Charles Devin Watkins, hereby certify that this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1.

/s/ *Devin Watkins*
Devin Watkins

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B)(i) because it contains 10,386 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5)(A) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the program used for the word count).

/s/ *Devin Watkins*
Devin Watkins